# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BNSF RAILWAY COMPANY**, | Case No. 3:17-cv-1716-JE |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **OREGON DEPARTMENT OF REVENUE and NIA RAY, in her official capacity as Director of the Oregon Department of Revenue**, | |
| Defendants. | |

Benjamin J. Horwich, Jessica Reich Baril, and Teresa A. Reed, MUNGER TOLLES & OLSON LLP, 560 Mission Street, Twenty-Seventh Floor, San Francisco, California 94105; James T. McDermott, BALL JANIK LLP, 101 SW Main Street, Suite 1100, Portland, Oregon 97204. Of Attorneys for Plaintiff.

Ellen F. Rosenblum, Attorney General; Marilyn J. Harbur, Senior Assistant Attorney General; and Daniel Paul, Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, Oregon 97301. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff BNSF Railway Company (BNSF) brings this action against the Oregon

Department of Revenue and its Director, challenging Oregon's tax on intangible personal

property as a discriminatory tax on railroads prohibited by the Railroad Revitalization and

Regulatory Reform Act of 1976 (4-R Act). Pub. L. 94-210, 90 Stat. 31. The case comes to the Court on cross-motions for summary judgment. In his Findings and Recommendation (F&R), United States Magistrate Judge John Jelderks recommended granting summary judgment in favor of Defendant. For the reasons that follow, the Court declines to adopt the F&R and instead grants BNSF's motion for summary judgment and denies Defendants' cross-motion.

Subsection (b)(4) of the 4-R Act prohibits states from imposing a tax on railroads "that discriminates against a rail carrier." 49 U.S.C. § 11501(b)(4). BNSF contends that the State of Oregon has violated this provision. BNSF seeks a permanent injunction, preventing Oregon from taxing BNSF in violation of the 4-R Act, as well as declaratory relief. Defendants argue that Oregon's tax comports fully with subsection (b)(4) of the 4-R Act because a property tax is not "another tax" within the meaning of the 4-R Act and because the United States Supreme Court has determined that Congress did not intend to prohibit states from granting property tax exemptions to non-rail entities while not exempting rail entities. In their briefing, the parties agree that there is no a genuine dispute of material fact and that the issue before the Court is purely a question of law.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

BNSF also seeks a permanent injunction to prevent a violation of subsection (b)(4), which it argues would occur if Oregon is permitted to maintain its current tax on intangible property of railroads. The 4-R Act gives a "broad grant of jurisdiction to federal courts to prevent violations of subsection (b)." *CSX Transp., Inc. v. Ala. Dep't of Revenue* (*CSX I*), 562 U.S. 277,

281 n.7 (2011). The traditional principles governing equitable relief do not apply where, as here, Congress has expressly authorized the granting of injunctive relief to halt or prevent a violation of federal law. *See United States* v. *Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000); *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983). Accordingly, if BNSF demonstrates that Oregon's taxation of intangible property of railroads violates the 4-R Act, BNSF will have sufficiently demonstrated that a permanent injunction is a necessary and appropriate remedy.

## BACKGROUND

In 1976, Congress enacted the 4-R Act to "restore the financial stability of the railway system of the United States." *Dept. of Revenue of Or. v. ACF Indus.*, 510 U.S. 332, 336 (1994) (quoting 45 U.S.C. § 801(a)). This legislation was needed, according to Congress, because railroads "'are easy prey for State and local tax assessors' in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality." *Id.* (quoting *W. Air Lines, Inc. v. Bd. Of Equalization of S.D.*, 480 U.S. 123, 131 (1987)). The United States Department of Transportation had documented this problem, noting that "'state and local governments derive substantial revenues from taxes on property owned by common carriers.' It is this temptation to excessively tax nonvoting, nonresident businesses in order to subsidize general welfare services for state residents that made federal legislation in this area necessary." *W. Air Lines*, 480 U.S. at 131 (quoting S. Rep. No. 91-630 at 4 (1969)). To remedy this problem, Congress passed the 4-R Act to "prohibit[] States (and their subdivisions) from enacting certain taxation schemes that discriminate against railroads." *ACF*, 510 U.S. at 336.

The provision of the 4-R Act at issue here, 49 U.S.C. § 11501(b), "bars states and localities from engaging in four forms of discriminatory taxation." *CSX I*, 562 U.S. at 280. The relevant section of the 4-R Act directs that states and their subdivisions may not:

(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11501(b)(1)-(4). In addition, the 4-R Act confers jurisdiction on federal courts to "prevent a violation" of subsection (b) of the Act, notwithstanding the Tax Injunction Act, 28 U.S.C. § 1341, which "ordinarily prohibits federal courts from enjoining the collection of state taxes when a remedy is available in state court." *CSX I*, 562 U.S. at 281; *see* 49 U.S.C. § 11501(c).

In Oregon, railroad companies are taxed through a process known as "central assessment." Only 14 types of businesses and services are subject to central assessment taxation: (a) railroad transportation; (b) railroad switching and terminal; (c) electric rail transportation; (d) private railcar transportation; (e) air transportation; (f) water transportation upon inland water of the State of Oregon; (g) air or railway express; (h) communication; (i) heating; (j) gas; (k) electricity; (l) pipeline; (m) toll bridge; and (n) private railcars of all companies not otherwise listed in this subsection, if the private railcars are rented, leased or used in railroad transportation for hire. Or. Rev. Stat. § 308.515. In 2017, there were 513 centrally assessed companies in Oregon.

For most taxpayers in Oregon, property is assessed by county officials, who then calculate the tax rate, determine taxpayers' tax liability, and collect payments. For centrally assessed businesses, however, Oregon calculates the value of "the entire property [owned by the business], both within and without the State of Oregon, as a unit." Or. Rev. Stat. § 308.555. After Oregon has determined the entire value of the business's property, it multiplies the value of that property by a percentage, known as the allocation factor, to determine the portion of that property subject to tax in Oregon. For a railroad, the allocation factor is calculated using the ratio of the single track mileage in Oregon to the total single track mileage, the ratio of miles traveled in Oregon to the total miles traveled, the ratio of Oregon operating revenue to all operating revenue, the ratio of the Oregon property cost to the cost of all property, and the ratio of Oregon revenue freight ton-miles to all revenue freight-ton miles. *See* Or. Admin. R. 150-308-0605.

Oregon employs two alternative methods for determining property value: Real Market Value (RMV) and Maximum Assessed Value (MAV). Or. Rev. Stat. § 308.146. The RMV is the actual assessed value of the property, while the MAV is limited to no more than 103 percent of the property's assessed value from the prior year or no more than 100 percent of the previous year's MAV, whichever is greater. *Id.* As between the RMV and the MAV, the lesser of these two values becomes the assessed value of the property, which forms the basis for a taxpayer's liability that year. *Id.* After the Department of Revenue determines the assessed value of the centrally assessed taxpayer's property, it prepares an assessment roll that county officials can rely on to collect tax payments. Or. Admin. R. 150-308-0670.

Oregon imposes an ad valorem property tax on all taxpayers in the state but defines property differently for non-centrally assessed taxpayers compared to centrally assessed

taxpayers. *See* Or. Rev. Stat. § 307.030. Under Oregon's generally applicable ad valorem property tax:

> (1) All real property within this state and all tangible personal property situated within this state, except as otherwise provided by law, shall be subject to assessment and taxation in equal and ratable proportion.
>
> (2) Except as provided in ORS 308.505 to 308.681, intangible personal property is not subject to assessment and taxation.

*Id*. Thus, the general rule under Oregon's generally applicable ad valorem property tax is that only real property and tangible personal property is subject to assessment and taxation. An exception to the general rule, however, is provided in Or. Rev. Stat. §§ 308.505 to 308.681, which contain the statutory provisions pertaining to centrally assessed taxpayers. For centrally assessed taxpayers, "'[p]roperty': . . . [m]eans all property of any kind, whether real, personal, tangible or intangible . . . ." Or. Rev. Stat. § 308.505. For most taxpayers in Oregon, intangible personal property is not subject to assessment and taxation, but for centrally assessed taxpayers—and only centrally assessed taxpayers—intangible personal property is included in the taxpayers' state property tax assessment.

   Plaintiff BNSF is a one of the largest railway companies in North America, with more than 23,000 miles of single track railway spanning the continent. Only two hundred sixty-six of those miles of track, however, run through Oregon. In 2010, Berkshire Hathaway acquired all of the outstanding shares of the Burlington Northern Santa Fe Corporation. After the acquisition, the company was renamed Burlington Northern Santa Fe, LLC, and Plaintiff BNSF became a wholly-owned subsidiary of Burlington Northern Santa Fe, LLC. As is common in corporate acquisitions, Berkshire Hathaway purchased BNSF for more than its book value. The difference between book value and purchase price is commonly referred to as "accounting goodwill." More than $14 billion dollars of accounting goodwill was recorded as an asset on Berkshire

Hathaway's balance sheet as a result of its acquisition of BNSF. Oregon law considers goodwill to be a form of intangible personal property. *See* Or. Admin. R. 150-307-0020.

During tax years 2011-2014, Oregon did not include this $14 billion of goodwill in its calculation of BNSF's property tax assessment. In 2015, however, Oregon began to include this goodwill in its calculation of BNSF's RMV. Because BNSF's MAV was calculated without including goodwill, it was the lesser of the two as between RMV and MAV. In 2015, therefore, BNSF was not required to pay taxes on the goodwill. In 2016, Oregon again included the goodwill in BNSF's RMV but not its MAV, and thus BNSF was not required to pay taxes on the goodwill. In 2017, however, Oregon for the first time included goodwill in its calculation of both MAV and RMV. In addition to the intangible personal property consisting of goodwill, Oregon also included more than $600 million of other forms of intangible personal property, including franchise and customer assets. As a result of the inclusion of this intangible personal property in BNSF's tax assessment in 2017, BNSF's MAV was approximately 30 percent higher than it had been in years past. Historically, BNSF had typically paid between $1.5 and $2.1 million in Oregon property taxes. In 2017, BNSF's tax bill was $2.9 million. According to BNSF, the inclusion of intangible personal property has inflated its tax bill by more than $600,000.

In October 2017, BNSF sued the Oregon Department of Revenue, alleging that Oregon has singled out and targeted BNSF and other railroad companies for disfavored treatment in violation of the 4-R Act. BNSF alleges that the tax on intangible personal property imposed by Oregon on BNSF is "another tax that discriminates against railroads" within the meaning of 49 U.S.C. § 11501(b)(4).

**DISCUSSION**

**A.  Whether Discrimination in Property Taxes Can Violate the 4-R Act**

Plaintiff and Defendants both invoke the Supreme Court's 1994 opinion in *ACF Industries* to support their respective positions. BNSF reads *ACF* to prohibit challenges under subsection (b)(4) only against exemptions from a generally applicable property tax and also reads *ACF* as recognizing that when railroads, as part of a small group of businesses, are singled out as the only ones required to pay a certain kind of property tax, that tax is a discriminatory tax prohibited by subsection (b)(4) of the 4-R Act. *ACF*, 510 U.S. at 346-47. Because railroads in Oregon are part of a targeted and isolated group singled out for disfavored treatment, BNSF argues, *ACF* instructs that Oregon's tax law violates subsection (b)(4).

In response, Defendants maintain that the challenged tax should be characterized as a generally applicable tax on property, from which intangible personal property for all non-centrally assessed taxpayers is exempt. In Defendants' view, the challenged tax is exactly the kind of tax exemption that *ACF* held was not prohibited by the 4-R Act. Because Congress enumerated three specific prohibited property tax practices in subsections (b)(1)-(3), Defendants argue, subsection (b)(4) should not be read to permit challenges to property taxes at all, and therefore no challenges to property taxes—no matter how discriminatory—can be brought under subsection (b)(4).

Each side's argument turns on the Supreme Court's opinion in *ACF*. In that case, as here, there was a challenge to a specific portion of Oregon's tax law.[1] In *ACF*, the plaintiffs—

---

[1] Defendants also argue that because an unrelated portion of Oregon's tax law was at issue in *ACF*, the Court should infer that the Supreme Court approved the entirety of Oregon's property tax scheme. Defendants base this argument in part on the fact that a footnote in *ACF*'s brief before the Supreme Court mentioned that Oregon did not tax intangible personal property of most taxpayers. This argument is not persuasive. An issue not actually litigated by the parties should not be presumed to have been decided by a court's silence on that issue.

companies that leased railroad cars to railroads and shippers—challenged Oregon's tax exemptions for some classes of tangible property (for example, agricultural machinery and equipment, livestock, and poultry) but not for railroad cars. The "railroad cars [owned by Plaintiffs in *ACF*] are considered 'tangible personal property' under Oregon Law, § 307.030, and are not exempt from taxation." *ACF*, 510 U.S. at 335. The *ACF* plaintiffs argued that the 4-R Act entitled them to the same tax exemptions that the most-favored taxpayers enjoyed and that anything less than most-favored taxpayer status amounted to unlawful discrimination under subsection (b)(4). *Id.* at 338-39.

Oregon, on the other hand, argued in *ACF* that "subsection (b)(4) does not speak to discriminatory property tax exemptions for the simple reason that the provision does not speak to property taxes at all." *Id.* at 339. Although the Supreme Court found both Oregon's reading of the statute and the plaintiffs' reading of the statute defensible when "read in isolation," in the end the Court adopted neither party's interpretation. Instead, the Court held, "a State may grant exemptions from a generally applicable ad valorem property tax without exposing the taxation of railroad property to invalidation under subsection (b)(4)." *Id.* at 340. The Court made clear that the 4-R Act was not violated simply because some taxpayers received an exemption that railroads did not also receive. By adopting a comparison class of "taxed property" in subsections (b)(1)-(3), the Supreme Court explained, Congress in the 4-R Act implicitly contemplated that some property would be tax-exempt. Further, if subsections (b)(1)-(3) expressly permit some property tax exemptions, it would be illogical to conclude that they were prohibited by subsection (b)(4). In reaching this ruling, the Supreme Court reviewed the importance of tax exemptions in state tax policy and found that principles of federalism directed that the 4-R Act did not deprive the states from using this important tool of tax policy. *Id.* at 344.

The Supreme Court also noted that *ACF* was

> not a case in which the railroads—either alone or as part of some
> isolated and targeted group—are the only commercial entities
> subject to an ad valorem property tax. If such a case were to arise,
> it might be incorrect to say that the State "exempted" the nontaxed
> property. Rather, one could say that the state had singled out
> railroad property for discriminatory treatment.

*Id*. at 346-47. BNSF argues that this is precisely the situation in the pending action.

After *ACF*, several federal courts had an opportunity to apply its holding, and its dicta, to

tax laws analogous to the state law at issue here. In 1995, the Eighth Circuit held that Iowa

violated subsection (b)(4) of the 4-R Act because Iowa did not impose a generally applicable tax

on personal property but required railroads and certain utilities to pay tax on all property—both

personal and real. *Burlington N. R.R. Co. v. Bair*, 60 F.3d 410, 411 (8th Cir. 1995). Iowa tried to

characterize the case as an exemption discrimination claim, like the claim in *ACF*, but the Eighth

Circuit rejected that contention because "Iowa's scheme does not even impose a generally

applicable tax on personal property." *Id.* at 413. *ACF*'s holding that shields exemptions from

generally applicable property taxes from challenge under subsection (b)(4), therefore, was not

dispositive. "Were it otherwise," the Eighth Circuit held, "the anti-discrimination purpose of the

4-R Act could utterly be eviscerated by a state that ostensibly imposed a tax of general

applicability but then systematically exempted all but a targeted few taxpayers." *Id*.

A district court in North Dakota reached a similar conclusion and enjoined North

Dakota's tax on personal property. As discussed in *Ogilvie v. State Bd. Of Equalization*, 893 F.

Supp. 882, 886 (D. N.D. 1995), North Dakota's tax system in theory taxed all property, both real

and personal. All personal property, however, was exempted from taxation, except for the

personal property of only five industries: (a) railroad companies; (b) airlines;

(c) telecommunications and mobile radio communications companies; (d) electric and gas

distribution companies; and (e) pipeline companies. Relying on the same passage from *ACF* that the Eighth Circuit did in *Bair*, the district court held that railroads had been "singled out . . . for discriminatory treatment" in violation of subsection (b)(4). *Id.* (quoting *ACF*, 510 U.S. at 447).

The following year, 1996, the Tenth Circuit followed suit and enjoined a Colorado law that exempted all commercial and industrial taxpayers other than certain utilities, including railroads, from a tax on intangible personal property. *Burlington N. R.R. Co. v. Huddleston*, 94 F.3d 1413, 1417 (10th Cir. 1996). The Tenth Circuit rejected Colorado's contention that "no property tax exemption, regardless of its nature or effect, is subject to challenge under" subsection (b). *Id.* (quotation marks omitted). "Otherwise, states could circumvent [subsection (b)] simply by enacting a tax of 'general application,' and then 'exempting' from the tax all but a certain class of taxpayers." *Id.* Whether phrased as an exemption or as a targeted tax, the Tenth Circuit in *Huddleston* found that railroads were being discriminated against and enjoined the challenged tax as violating subsection (b)(4).

Oregon repeats the same arguments that were rejected by the Eighth and Tenth Circuits and by the district court in North Dakota. Oregon argues that the failure to tax non-centrally assessed taxpayers' intangible personal property is the equivalent of granting an exemption from a generally applicable tax to all taxpayers except those centrally assessed and thus falls within *ACF*'s holding. In addition, Oregon relies on a Seventh Circuit case that shares some of the same characteristics of the cases from the Eighth and Tenth Circuits but resulted in a favorable ruling for Wisconsin. In *Burlington Northern Railroad Company v. Wisconsin Department of Revenue*, 59 F.3d 55 (7th Cir. 1995), Wisconsin levied a property tax "upon all general property" but then exempted 80 percent of all property from taxation. *Id.* at 57. Rather than hold that a discriminatory tax framed as an exemption can never give rise to challenge under subsection

(b)(4), the Seventh Circuit recognized that "a nominally general tax which is in fact a tax only on railroads" could be prohibited by subsection (b)(4). *Id.* The Seventh Circuit distinguished the case before it from *Ogilvie* because "Wisconsin's tax . . . unlike North Dakota's, is a universal tax which exempts certain classes of property. The exemptions do not depend on whether the business which owns the property is locally or centrally assessed." *Id.* at 57 n.1. In the Wisconsin case, just like in *ACF*, the exemptions were based on the kind of property at issue, not on the type of owner of the property, and thus did not discriminate against railroads. That makes the Wisconsin case distinguishable from *Bair*, *Ogilvie*, and *Huddleston*—and from this case. In the pending dispute, additional Oregon property taxes are levied against railroads because the property in question is owned by a railroad.

*ACF*'s central holding, when first announced by *ACF* and repeated in later Supreme Court decisions, has always remained the same: a railroad cannot invoke subsection (b)(4) "to challenge a *generally applicable* property tax on the basis that certain non-railroad property was exempt from the tax." *CSX I*, 562 U.S. at 283 (emphasis added). The statute that Oregon repeatedly refers to as its "generally applicable ad valorem property tax" statute actually is a tax only on "[a]ll real property within this state and all *tangible* personal property." Or. Rev. Stat. § 307.030(1) (emphasis added). *Intangible* personal property, however, is not included in the generally applicable property tax statute. The Oregon tax statute continues by stating that "except as provided in [the provisions relating to centrally assessed property], intangible personal property is *not* subject to assessment and taxation." Or. Rev. Stat. § 307.030(2) (emphasis added). Oregon's tax law, thus, provides that, as a general matter, intangible personal property is *not* subject to taxation *except* for property owned by centrally assessed taxpayers.

Stated another way, there is no generally applicable intangible personal property tax in Oregon. The granting of exemptions from a generally applicable tax is not what this case is about. BNSF is not challenging an exemption from a generally applicable tax. Instead, BNSF is challenging a tax that, in actuality, is levied on only a small category of businesses, including railroads. To view the tax on intangible personal property as a form of tax exemption requires an unnatural reading of Oregon's tax laws. Unlike the tax on the tangible personal property (the railroad cars) owned by the plaintiffs in *ACF*, Oregon does not even impose a generally applicable tax on intangible personal property. Thus, this case more closely resembles the trio of *Bair*, *Huddleston*, and *Ogilvie*, than *ACF*.

Ultimately, whether Oregon's tax on intangible personal property is characterized as a generally applicable tax from which all taxpayers other than centrally assessed taxpayers are exempt or as a tax that is only levied on centrally assessed taxpayers might, however, be a distinction without a difference. Even if the Court were to accept Defendants' characterization of the tax as an exemption from a generally applicable ad valorem property tax, that characterization alone would not immunize the tax from challenge under subsection (b)(4). Congress passed the 4-R Act to restore the financial stability of the United States' railway system and protect railways from being "easy prey for state and local tax assessors." *W. Air Lines*, 480 U.S. at 131 (quoting S. Rep. No. 91-630, at 3 (1969)). If the Court were to accept Defendants' argument that characterizing Oregon's tax on intangible personal property of centrally assessed businesses as a tax exemption protects that tax from challenge under *ACF*, "the anti-discrimination purpose of the 4-R Act could utterly be eviscerated by a state that ostensibly imposed a tax of general applicability but then systematically exempted all but a targeted few taxpayers." *Bair*, 60 F.3d at 413. Any tax can be framed as either a targeted tax or

as a tax exemption. A statute that reads "Only Smith must pay taxes" achieves the same result as

a statute that reads "(1) Everyone must pay taxes; and (2) Everyone except Smith is exempt from

this statute." It is unlikely that Congress would have intended to allow states to circumvent the

anti-discrimination purpose of the 4-R Act merely by adopting a formalistic interpretation of

what constitutes a tax exemption.

*ACF* recognized that just such a situation could occur and suggested that, if it did, that

could violate subsection (b)(4). When "railroads—either alone or as part of some isolated and

targeted group—are the only commercial entities subject to an ad valorem property tax . . . one

could say that the state had singled out railroad property for discriminatory treatment." *ACF*, 510

U.S. at 346-47.[2] *ACF* noted that in such a case, it might be "incorrect to say that the state

'exempted' the nontaxed property." *Id.* at 346. Because the tax at issue in *ACF* did not single out

railroads, the Supreme Court did not need to "decide whether subsection (b)(4) would prohibit a

tax of that nature." *Id.* at 347. The situation that *ACF* expressly stated was not present in that

case, however, appears to be the circumstance raised in the pending action.

In 2011, the Supreme Court decided another case under the 4-R Act and again had the

opportunity to interpret subsection (b)(4). Defendants argue that the 2011 case, *CSX I*, breaks the

line of cases discussed above and substantially narrows—if not eliminates—the availability of

---

[2] Defendants argue that this dicta from *ACF* referred only to occupation taxes because *ACF* cited a case dealing with occupation taxes. In *ACF*, however, the Supreme Court specifically used the term "ad valorem property tax" in its example, and the only reference to an occupation tax occurs in the citation of *Burlington Northern Railroad Company v. Superior*, 932 F.2d 1185 (7th Cir. 1991), which follows a *cf.* signal. *See* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 1.2(a), at 58 (Columbia Law Review Ass'n, et al. eds., 20th ed. 2015) (defining "*cf*" as "Cited authority supports a proposition different from the main proposition but sufficiently analogous to lend support."). Further, Defendants' assertion that this dicta was intended to suggest that an ad valorem property tax that applied only to railroads might be discriminatory not under subsection (b)(4) but under subsection (b)(1) is belied by the fact that that Court expressly refers to subsection (b)(4) in its example.

subsection (b)(4) to challenge discriminatory property taxes. In *CSX I*, petitioners challenged Alabama's sales and use tax on diesel fuel, which railroads were required to pay, but from which the railroads' main competitors, interstate motor and water carriers, were exempt. *CSX I*, 562 U.S. at 282. The petitioners in *CSX I* challenged the sales and use tax as a discriminatory tax under subsection (b)(4), but Alabama argued that, under *ACF*, railroads could not challenge taxes from which their competitors were exempt as discriminatory. *CSX I*, 562 U.S. at 283.

In *CSX I*, the Supreme Court first held that the words "another tax" under subsection (b)(4) should be given their ordinary definition. "Another tax, as used in subsection (b)(4), is best understood to . . . encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)-(3)." *CSX I*, 562 U.S. at 285. Turning next to the meaning of the word "discriminate," the Court concluded that "'[d]iscrimination' is the 'failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.'" *CSX I*, 652 U.S. at 286 (quoting BLACK'S LAW DICTIONARY 534 (9th ed. 2009)). The Court explained that "a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4)." *Id.* at 288. Thus, a generally applicable tax that granted exemptions to some but did not grant those same exemptions to railroads could be found to be a discriminatory tax in violation of subsection (b)(4).

Recognizing that there may be a tension between its decisions in *ACF* and *CSX I*, the Supreme Court addressed the differences between the two cases. The Court explained that in *ACF* because "[s]ubsections (b)(1)-(3) permitted States to impose property taxes on railroads while exempting other entities," it followed logically that "[s]ubsection (b)(4)'s prohibition on discrimination likewise could not encompass property tax exemptions." *CSX I*, 562 U.S.

at 290-91. "The structure of § 11501 thus compelled [the Court's] conclusion that property tax exemptions—even if 'a variant of tax discrimination'—fell outside subsection (b)(4)'s reach." *Id.* at 291 (quoting *ACF*, 510 U.S. at 343).

Defendants argue that two specific phrases from *CSX I* should be interpreted to mean that the Supreme Court did not intend for property taxes, no matter how discriminatory, ever to be subject to challenge under subsection (b)(4). First, Defendants read the Supreme Court's words that "'[a]nother tax,' as used in subsection (b)(4), is best understood to . . . encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)-(3)" to mean that subsection (b)(4) encompasses any kind of tax *other than* a property tax. *Id.* at 285. This argument that subsection (b)(4) cannot be applied to any type of property tax previously was advanced by Oregon in *ACF*, where it was rejected by the Supreme Court. *See ACF*, 510 U.S. at 443. The Supreme Court in *CSX I* gave no indication that it intended to revisit the conclusion reached in *ACF*. Further, not only did the Supreme Court in *CSX I* expressly mention that taxes "on any asset" are encompassed by subsection (b)(4), which implies that it contemplated that some property taxes could fall under subsection (b)(4), but the Supreme Court also expressly stated that subsection (b)(4) included any form of tax "except *the* taxes on property *previously addressed* in subsections (b)(1)-(3)." *CSX I*, 562 U.S. at 285 (emphasis added). The most logical reading, and perhaps the only logical reading, of the Supreme Court's text is that only the specific property tax practices explicitly approved in subsections (b)(1)-(3) cannot be challenged under subsection (b)(4).

Defendants also rely on the text in *CSX I* that "property tax exemptions—'even if a variant of tax discrimination'—fell outside subsection (b)(4)'s reach." *Id.* at 291. These words, when read in isolation, appear at first glance to support Defendants' position that property taxes,

no matter how discriminatory, cannot be challenged under subsection (b)(4). This conclusion, however, fails for at least two reasons. First, in *CSX I*, the Court held that granting exemptions from a generally applicable sales and use tax to some entities, but not giving those same exemptions to railroads, could be a variant of tax discrimination prohibited by subsection (b)(4). This was the same practice that, in the property tax context, *ACF* had allowed. In *CSX I*, the Supreme Court clarified that *ACF* reached the outcome that it did because "[e]ven assuming property tax exemptions 'discriminate[d],' they did so in a way that the specific provisions of §§ 11501(b)(1)-(3) allow." *Id.* at 294. The Supreme Court in *CSX I* explained that *ACF*'s holding was based on the structure of subsections (b)(1)-(3), not on the meaning of the term "discriminate." Because the Court stated in *CSX I* that all tax exemptions are *per se* discriminatory, property tax exemptions, even those approved under subsections (b)(1)-(3), are still a type of tax discrimination. When *CSX I* referred to property tax exemptions as a variant of tax discrimination that falls outside the reach of subsection (b)(4), it did not mean that property tax exemptions could never be discriminatory. The Supreme Court only clarified that subsections (b)(1)-(3) specifically allowed some forms of discrimination, and what is allowed under subsections (b)(1)-(3) cannot be prohibited by subsection (b)(4).

Second, the Supreme Court in *ACF* stated that the kind of tax at issue here, where railroads, as part of a targeted or isolated group, are the only ones subject to an ad valorem property tax, would not be properly considered a tax "exemption" in the first place. *ACF*, 510 U.S. at 346-47. The Court in *ACF* emphasized that in a case where "railroads— either alone or as part of some isolated and targeted group—are the only commercial entities subject to an ad valorem property tax . . . it might be incorrect to say that the State had 'exempted' the nontaxed property." *Id.* Further, the Court in *ACF* added that "one could say that the State had singled out

railroad property for discriminatory treatment" in violation of subsection (b)(4). *Id.* Because a tax that singles out for disfavored treatment a small group including railroads is not, according to the Supreme Court in *ACF*, properly considered a "tax exemption" at all, *CSX I*'s text about the reach of subsection (b)(4) not including discriminatory property tax *exemptions* does not apply to this situation. When properly read, taking into account the context of both *ACF* and the issues at stake in *CSX I*, the portions of *CSX I* that Defendants rely upon do not support their conclusion.

Further confirming this view that *CSX I* did not intend to scale back or overturn the dicta from *ACF* is the fact that *CSX I* never recognized that it was doing so, or that it was overruling a string of circuit court opinions that relied on *ACF*'s text to enjoin discriminatory property taxes under subsection (b)(4). The questions of whether subsection (b)(4) could prohibit discriminatory property taxes and whether an exemption that singled out railroads for disfavored treatment violated subsection (b)(4) simply were not presented in *CSX I*. That case did not involve property taxes at all. As the Fourth Circuit explained, if the Supreme Court in *CSX I* had intended to announce a new exception for property taxes under subsection (b)(4)

> one certainly would have expected the Court to have explained (1) why the Court even raised that issue; (2) the legal basis for the new exception; and (3) the tension that would exist between the new exception and the *ACF* Court's suggestion that (b)(4) might be violated if a railroad was 'singled out' for unfavorable treatment in the form of inability to benefit from property tax exemptions given to other taxpayers.

*CSX Transp., Inc. v. S.C. Dep't of Revenue*, 851 F.3d 320, 331 (4th Cir. 2017). In the absence of these indicia of intent to alter *ACF*, this Court agrees with the Fourth Circuit that the dicta in *ACF* and the line of cases from the mid-1990s following it (including *Ogilvie*, *Bair*, and *Huddleston*) remain intact. It is the holding of this Court that if Oregon's tax on intangible personal property is construed as a tax exemption, discriminatory property tax exemptions that

single out railroads for disfavorable treatment as part of a small and isolated group can be challenged under subsection (b)(4) of the 4-R Act.

**B.  Whether Oregon's Tax on Intangible Personal Property Unlawfully Discriminates**

Having established that BNSF can bring a challenge to Oregon's tax on intangible personal property as discriminatory in violation of subsection (b)(4), the Court turns next to whether Oregon's tax is in fact unlawfully discriminatory. This case comes to us on cross-motions for summary judgment, and neither party argued in briefing that there were any material facts in dispute. Further, both parties agree that the relevant comparison class in this case is other commercial and industrial taxpayers. *See generally Ala. Dep't of Revenue v. CSX Transp., Inc.* (*CSX II*), 135 S. Ct. 1136, 1141 (2015). A state law discriminates under subsection (b)(4) if it "treats groups that are similarly situated differently without sufficient justification for that difference in treatment." *CSX II*, 135 S.Ct. at 1141 (quoting *CSX I*, 562 U.S. at 287) (internal quotation marks and alterations omitted). Thus, the relevant questions are whether under Oregon law railroads are treated differently than other commercial and industrial taxpayers and, if so, whether Oregon has provided a justification for that difference in treatment. *See CSX I*, 562 U.S. at 287.

Defendants concede that non-centrally assessed commercial and industrial taxpayers, such as Nike and Precision Castparts, own vast amounts of intangible personal property but are not required to pay taxes on that property. Further, Defendants do not dispute that railroads are treated differently than other taxpayers. Instead, Defendants argue that this differential treatment is due to the valuation challenges presented by the multi-state nature of centrally assessed companies. Defendants argue that differences in local assessment and central assessment of property, along with the overlay of Article XI, section 11, of the Oregon Constitution, "confute plaintiff's argument that discrimination exists." Defendants explain that, for centrally assessed

properties, property taxes are assessed on "an allocated unit valuation of a group of assets as 'one property' without reference to the individual value of the component parts."

Defendants, however, do not provide a justification for differences in treatment. Although Defendants appear to argue that it is difficult to disentangle the values of real property, tangible property, and intangible property for multi-state companies (and, thus, easier simply to count the value of all the property as one lump sum), Oregon also is capable of exempting certain classes of intangible property owned by centrally assessed companies from taxation. For example, even for centrally assessed taxpayers, property "[d]oes not include items of intangible property that represent: . . . [c]laims on other property, including money at interest, bonds, notes, claims, demands or any other evidence of indebtedness, secured or unsecured . . . [a]ny shares of stock in corporations, joint stock companies or associations." Or. Rev. Stat. § 308.505(14)(c). Because Oregon is capable of distinguishing between intangible property in the form of goodwill or software from intangible property in the form of bonds, notes, and stock, Oregon's argument that it is "too difficult" to distinguish between the component parts of property owned by centrally assessed taxpayers is not persuasive. Further, Defendants do not explain why it is more difficult to distinguish tangible and intangible personal property for centrally assessed businesses like BNSF than for businesses not subject to central assessment, such as Nike.

The Supreme Court has recognized at least one acceptable justification for different treatment of railroads. *See CSX II*, 135 S. Ct. at 1143. A tax is not discriminatory under subsection (b)(4), even if it is levied only on railroads, if non-railroad entities must pay another comparable tax from which the rail carrier is exempt. *Id*. Defendants, however, do not argue that Oregon's different treatment of railroads is justified because non-centrally assessed taxpayers must pay another tax from which centrally assessed taxpayers are exempt. Defendants also do

not argue in their briefing that there are any genuine issues of material fact over its tax treatment of railroads as compared to other commercial and industrial taxpayers.[3]

Defendants also argue that Oregon's tax scheme is justified because of its longstanding historical pedigree. This argument is unpersuasive: Discrimination has never been allowed simply because it is longstanding. Further, the 4-R Act was enacted expressly to prohibit discriminatory tax practices by states. Thus, the fact that Oregon's tax practice pre-dates the 4-R Act is not persuasive evidence that the practice does not violate the statute. *See W. Air Lines*, 480 U.S. at 131

Finally, for the first time at oral argument, Defendants argued that the factual record should be further developed to determine whether the group of centrally assessed taxpayers was truly isolated and targeted. Defendants assert that this group includes several politically powerful companies in the State, such as Comcast and AT&T. Arguments raised for the first time at oral argument are generally considered waived. *See In re Pac. Pictures Corp.*, 679 F.3d 1121, 1130 (9th Cir. 2012). Even if the Court were to entertain the argument that railroads in Oregon are not part of an isolated and targeted group because several other businesses are included in the group of centrally assessed taxpayers, Defendants' argument would fail.

Only 14 types of entities are subject to central assessment, and nearly half of those entities are involved in the railroad industry. *See* Or. Rev. Stat. § 308.515. The statute specifically calls out the rail industry by name in six of the fourteen types of industries subject to

---

[3] At oral argument, Defendants asserted that BNSF specifically had not been treated unfavorably by the Oregon tax scheme because BNSF has benefitted disproportionately from Oregon's Measure 50 and is assessed at slightly more than 80 percent of its real market value, while some railroad companies are paying tax on the full amount of their real market value. The 4-R Act, however, prohibits discriminatory taxes on railroads generally, and a challenge to a discriminatory tax scheme cannot fail simply because one particular railroad that is subject to one discriminatory tax also receives an unrelated tax benefit.

the tax, which also includes air transportation, communication, heating, gas, electricity, pipelines, and toll bridges. *Id*. Other courts have concluded that a group including railroads, airlines, utilities, and telecommunications companies was a sufficiently isolated and targeted group to fall within the exception outlined in *ACF*. *See Huddleston*, 94 F.3d at 1414 (group included railroad, airline, electric, telephone, telegraph, gas, domestic water, pipeline, coal slurry, and private rail companies); *Bair*, 60 F.3d at 411 n.2 (group included public utilities, telephone and telegraph companies, railroads, express companies, electric companies and pipeline companies); *Ogilvie*, 893 F. Supp. at 886 (group included railroad companies, airlines, telecommunications and mobile radio communications companies, electric and gas distribution companies, and pipeline companies). Even in 1995 and 1996, when *Bair*, *Ogilvie*, and *Huddleston* were decided, telecommunications companies, pipelines, airlines, and utilities were large and politically powerful companies. None of those courts found that the inclusion of a few powerful companies in the disfavored group mitigated the discriminatory structure of the tax. Because the Oregon tax statute here, just like the statutes at issue in *Bair*, *Huddleston*, and *Ogilvie*, singles out railroads as part of a small group for different and unfavorable tax treatment as compared to all other commercial and industrial taxpayers, the conclusion does not follow that the statute does not target railroads for disfavored treatment.

It is irrelevant whether a group of centrally assessed taxpayers includes some large companies because the relevant comparison class is all commercial and industrial taxpayers. The question is not whether BNSF is treated differently than other centrally assessed taxpayers, but rather whether railroads generally are treated worse than other commercial and industrial taxpayers. Other commercial and industrial taxpayers own vast amounts of intangible personal property and do not pay taxes on that property, and Oregon imposes no equivalent tax on non-

centrally assessed taxpayers that would justify this disparate treatment. This constitutes

discrimination against railroads that is prohibited by the 4-R Act. *See CSX II*, 135 S. Ct. at 1141.

Further, <u>throughout</u> their briefs, Defendants argued that there were no material facts in dispute.

At oral argument, Defendants asserted for the first time that the factual record needs further

development. Defendants' assertion is untimely. In addition, Defendants have not identified any

specific material factual dispute regarding what Defendants concede are differences between the

taxation of centrally assessed taxpayers, including railroads, and the taxation of other

commercial and industrial taxpayers. Accordingly, under § 11501(c) of the 4-R Act, Oregon is

enjoined from taxing the intangible personal property of railroads as it currently does.

## CONCLUSION

The Court declines to adopt the F&R (ECF 35) and instead grants BNSF's motion for

summary judgment (ECF 19) and denies Defendants' cross-motion (ECF 25).

**IT IS SO ORDERED**.

DATED this 14th day of December, 2018.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge